[Cite as *In re S.M.I.*, 2019-Ohio-2342.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| S.M.I., | : | No. 18AP-376 |
| | | (C.P.C. No. 16JU-0730) |
| (H.H., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| | : | |

D E C I S I O N

Rendered on June 13, 2019

**On brief:** *Lawrence L. Levinson,* for appellant.

**On brief:** *Robert J. McClaren,* for appellee Franklin County
Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

NELSON, J.

{¶ 1} Judge Rapp in his detailed opinion for the domestic court laid out many of the challenges confronting four-year-old S.M.I. and his caregivers in this permanent custody case:

> [S.M.I.] has a congenital heart defect. He has had a leg amputation below the knee and requires a wheel chair. There is a small chance he may eventually be fitted with a prosthesis and successfully walk. He has had a brain hemorrhage and has cerebral palsy. He cannot eat on his own. All nourishment requires feeding tubes (G/J Tubes). He aspirates and requires suction every 5 minutes to every hour without which he would suffocate and/or contract pneumonia. He is to not travel if the temperature is below 40 degrees. Routine medical appointments often need to be rescheduled. He requires a ventilator and tracheotomy care and monitoring by a pulse oximeter 24/7. In addition to frequent medical appointments,

> he receives physical and speech therapy weekly. He is very developmentally delayed. He makes sounds but cannot speak or walk. He is * * * learning to bear weight and sit in a high chair. He has approximately nine prescriptions that must be administered six times throughout each day.

May 2, 2018 Jgmt. Entry Granting Permanent Custody at 8-9.

{¶ 2}    Born "24 weeks premature * * * , [S.M.I.] spent his first seventeen months in hospitalization after which he was placed in a foster home licensed to care for medically fragile children. [He] has never lived with either [biological] parent." *Id.* at 6. He has lived in the home and care of his foster parents since June 1, 2016. *Id.* at 7. S.M.I. "is bonded with his foster parents and the other members of his foster family. His bedroom is in the center of the first floor of the house and he is also the center of attention. He is very comfortable in his current foster home. [Through extraordinarily commendable efforts,] [t]he foster parents are able to meet [his] needs. The foster parents are not prospective adoptive parents." *Id.* at 12 (emphasis omitted).

{¶ 3}    The domestic court opinion describes the circumstances under which the Franklin County Children Services agency ("the County") was granted temporary custody of S.M.I. as a dependent child on January 26, 2016; how after a no contest plea pursuant to Juv.R. 29(C), the trial court approved reunification "Case Plan Number 2" as filed April 14, 2016; that on June 1, 2016, with no appeal having been taken from the adjudication/disposition entry, the foster parents took S.M.I. into their home; and that the court granted a six-month extension of the County's custody over S.M.I. on January 24, 2017, while also adopting reunification Case Plan 2.02. *Id.* at 6-7. On February 1, 2017, the trial court determined that the County had "made reasonable efforts to prevent the continued removal of the child from the home and to implement a permanency plan." Feb. 1, 2017 Findings of Fact and Conclusions of Law.

{¶ 4}    The County filed its motion for permanent custody on June 22, 2017. The trial court conducted a termination hearing on March 21, 2018 and heard testimony from S.M.I.'s biological mother and father, his foster mother, his guardian ad litem, and the County case worker.

{¶ 5}    The domestic court granted permanent custody of S.M.I. to the County. Although the Judgment Entry from which S.M.I.'s mother now appeals appropriately

assesses the relevant legal standards point by point, it is fair to characterize the decision as informed generally on the one hand by the fact that S.M.I. needs—that is, that he absolutely depends upon—"24/7 care" requiring "specialized knowledge, skills," undeviating vigilance, and on the other by a demonstrated inability or unwillingness on the part of his biological parents to acquire that knowledge and skill and follow through on his doubtlessly daunting needs. *Compare, e.g., id.* at 8-9 (critical need for unstinting, never neglected care) *with id.* at 12 (reciting "Parents' failure to complete the reunification case plan, their lack of [achieving] training to meet [S.M.I.'s] needs, and Parents' lack of establishing a bond with [him]").

{¶ 6}     The domestic court emphasized that "[t]here was absolutely no evidence to suggest that Mother and Father had not appropriately cared for [S.M.I.'s] four siblings." *Id.* at 8.  But as a "medically fragile" child, S.M.I. presents special and essential needs that the court found his biological parents (who do not reside together) do not and are not likely to meet.  *See, e.g., id.* at 9, 11 ("Parents failed to meet [S.M.I.'s] basic needs, an essential component of the case plan"; "Parents failed to present credible and reasonable explanations of their failure to visit or contact" him; he "has significant special needs that Parents are unable or unwilling to provide").  By contrast, the court found, S.M.I.'s foster parents "received training and are licensed to provide foster care for medically fragile children, [and] the foster mother [a retired nurse] received additional training over a period of two weeks before [S.M.I.] was released from the hospital to the foster home."  *Id.* at 8.

{¶ 7}     In asking us to reverse the grant of permanent custody and to instruct that the County be told to pursue efforts now "to reunify S.M.I. with mother," Appellant's Brief at 21, S.M.I.'s biological mother advances two assignments of error.  She argues first that the "trial court's determination that the appellant's parental rights should be terminated is not supported by clear and convincing evidence," and second that the "trial court's determination that the agency made reasonable efforts to unify this family is not supported by clear and convincing evidence."  Appellant's Brief at 5.

{¶ 8}     We begin our review by acknowledging the enormous gravity of the parent-child issues implicated here and in any permanent custody matter.  The Supreme Court of Ohio has underscored that the right to raise one's children "is a fundamental right." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, *citing Troxel v. Granville*, 530 U.S. 57, 66

(2000) (citation omitted); *see also, e.g., In re Hayes*, 79 Ohio St.3d 46, 48 (1997) (" 'essential' and 'basic' civil right"), quoting *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Because an award of permanent custody is the most drastic disposition available under the law, it is an alternative of last resort and is only justified when it is necessary for the welfare of the children." *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26, citing *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979).

{¶ 9}   Ohio statute specifies procedures to safeguard the vital interests at stake.  "A decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18.  First (as a matter of practice, we have said, albeit not by statutory sequencing), the court must determine by clear and convincing evidence whether any one of five "threshold findings" applies.  *Id.*; *see* R.C. 2151.414(B)(1)(a) through (e).  Here, there is no dispute but that the County "satisfied" this requirement "by demonstrating that S.M.I. was in the [temporary] custody of the agency for 12 months out of a consecutive twenty-two-month period."  Appellant's Brief at 15; *see* R.C. 2151.414(B)(1)(d).  So the court's inquiry then turns to whether "it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion." R.C. 2151.414(B)(1).

{¶ 10} "The burden of proof falls upon [the County] to prove by clear and convincing evidence that an award of permanent custody is in the child's best interest."  *In re KL* at ¶ 20 (reciting statute).  Clear and convincing evidence " 'is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established' "; it requires " 'more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt.' "  *In re K.D.,* 10th Dist. No. 18AP-746, 2019-Ohio-1077, ¶ 31 (citation omitted).

{¶ 11} In making the critical "best interest" assessment, the court is required to "consider all relevant factors, including, but not limited to," five specified considerations. R.C. 2151.414(D)(1)(a) through (e).  Here, after considering the statutorily identified factors, the trial court determined it "abundantly clear" that a grant of permanent custody to the County is in S.M.I.'s best interests.  Jgmt. Entry Granting Permanent Custody at 12, 13 (at one page apparently making unfortunate clerical error regarding S.M.I.'s name).

{¶ 12}  We "review the evidence to determine whether competent, credible evidence supports the trial court's best interest finding [as made under the clear and convincing evidence standard]."  *In re J.S.*, 10th Dist. No. 05AP-615, 2006-Ohio-702, ¶ 23 (citation omitted).  That is because a "trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence.  'Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' "  *Id.* at ¶ 21, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312 at ¶ 28; *Young v. Univ. of Akron*, 10th Dist. No. 04AP-318, 2004-Ohio-6720, ¶ 25, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶ 13}  The trial court examined each of the statutorily-required "best interest" factors.  Although Appellant's Brief does not address these factors point-by-point, we will attempt to associate the arguments that the biological mother does advance with each factor where arguably pertinent.

{¶ 14}  First, R.C. 2151.414(D)(1)(a) necessitates an examination of S.M.I.'s "interaction and interrelationship" with his "parents, siblings, relatives, foster caregivers and out-of-home providers," and with anyone else "who may significantly affect" him.  S.M.I. has been hospitalized or in foster care for his entire life:  he "has never lived with either Parent."  Jgmt. Entry Granting Permanent Custody at 6.  His mother seems to argue that she was not responsible for the lack of a sustained relationship with her son:  She submits that "[n]o training was set up for Mother to learn for the care of S.M.I."; that transportation was arranged for her only on occasion; that "Agency placement to foster parents specially equipped to handle S.M.I. at the outset made it nearly impossible for her son to be placed with Mother on a best interest basis"; that "she attended appointments but could not remember the dates, but there were a number of them"; and that "it is possible S.M.I. could benefit from placement with his siblings."  Appellant's Brief at 17-18.

{¶ 15}  The record supports the trial court's observations that:

> [T]he reunification plan allowed for at least weekly visitation
> by Parents.  The Guardian ad Litem (appointed on January 26,
> 2016) had a responsibility to attempt to observe visitations
> between the Child and Parents.  He gave his business card to
> Mother.  He made calls to Mother and left messages.  She never
> returned his calls.  Father never visited the Child after June 5,

> 2016. Mother never visited the Child after June 21, 2017. *There was no attempt by parents to establish a bond with [S.M.I.].*
>
> * * *
>
> The child is bonded with his foster parents and the other members of his foster family. * * * He is very comfortable in his current home. * * * *

Jgmt. Entry Granting Permanent Custody at 11-12 (emphasis in original); *see, e.g.,* Tr. at 29 (biological mother attended very few medical appointments), 63 and 258 (didn't call G.A.L), 197 (biological mother wouldn't keep appointments to meet with County caseworker), 224 (same), 245-46 (biological mother hasn't attended most medical appointments), 258 (G.A.L. "absolutely" comfortable with foster placement and bonding there).

{¶ 16} The domestic court also was entitled to find, as it did, that Mother's testimony that she was never told she needed training or given the chance to learn "was not credible. Mother admitted that she never asked the case worker for help to get training." Jgmt. Entry Granting Permanent Custody at 8; *see, e.g.,* Tr. at 51 (never inquired re medications), 60-62 (never reached out to caseworker re training help).

{¶ 17} Evidence also supports the domestic court's conclusions that: "Since [S.M.I.'s] release from the hospital on or about June 5, 2016, Mother attended only three of [his] many medical appointments. Father attended no appointments. Mother did not know [S.M.I.'s] medical diagnosis although she knew he had a leg amputation and needs a feeding tube. Mother mistakenly believes [he] can eat but 'not big stuff.' Mother did not know the names of any of [his] doctors. She did not know if [he] needed prescription medications. Had Parents consistently attended [his] many medical appointments, they would have acquired essential knowledge and the medical providers would have determined what training was necessary for Parents to care for their medically fragile Child." Jgmt. Entry Granting Permanent Custody at 9; *see, e.g.,* Tr. at 29 (biological mother attended only very limited number of medical appointments), 19-20 (not aware of many diagnoses and needs; unfamiliar with who S.M.I.'s doctors are), 35 (same with medications), 20 (not aware that S.M.I. cannot ingest anything through mouth).

{¶ 18} The biological parents did not use taxi services when arranged for them, and the agency caseworker was unable to schedule monthly meetings with the parents to discuss medical needs and visitation arrangements; she was able to meet in person with S.M.I.'s mother only on very limited occasion.  Jgmt. Entry Granting Permanent Custody at 10; *see, e.g.*, Tr. at 205, 225 (did not take advantage of transportation offers), 198-99 (biological mother met with caseworker only three times over life of case; biological father never met with caseworker).

{¶ 19} As further recited by the domestic court, the parent's visitations with S.M.I. apparently were hampered by failure (on the part of the father) and delay (by the mother) in getting requested vaccinations to protect S.M.I.  Jgmt. Entry Granting Permanent Custody at 10*; see* Tr. at 212-13*.*  Mother does not dispute the court's finding that after S.M.I.'s first release from the hospital, "Mother's only visitation or contact occurred at three medical appointments: August 15, 2016; April 19, 2017; and June 21, 2017.  Her last visit with [him] was after his leg amputation."  Jgmt. Entry Granting Permanent Custody at 11.

{¶ 20} Evidence in the record supports a view that the biological parents were afforded opportunity to get to know S.M.I. and to learn about what is required for his care, but failed to do so.  *See, e.g.,* Tr. at 261-63 (testimony of G.A.L.), 199 (caseworker testimony).  And competent, credible evidence supports a view that the "interaction and interrelationship" factor weighs in favor of the award of permanent custody to the County.  *See, e.g.,* Tr. at 258-61 (contrast between attention provided by S.M.I.'s foster parents and by his biological parents).

{¶ 21} The same is true for the second factor, the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem."  *See* R.C. 2151.414(D)(1)(b).  S.M.I.'s guardian ad litem recommends the grant of permanent custody to the County.  Tr. at 263; Jgmt. Entry Granting Permanent Custody at 12 ("Among other reasons for the recommendation:  Parents' failure to complete the reunification case plan, their lack of training to meet [S.M.I.'s needs], and Parents' lack of establishing a bond with [him]").

{¶ 22} The third factor requires consideration of "[t]he custodial history of the child."  R.C. 2151.414(D)(1)(c).  The domestic court was correct in noting that S.M.I. "spent his first seventeen months in hospitalization after which he was placed in a foster home licensed to care for medically fragile children," Jgmt. Entry Granting Permanent Custody

at 6, and that he "has been in the temporary custody" of the County from January 26, 2016 onward, *id.* at 12. Again, this factor weighs in favor of the trial court's determination.

{¶ 23} The fourth factor in determining "best interest" looks to the "child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). Mother says that she "demonstrated she has a safe and stable home and a secure source of income"; that she "was aware of the care that S.M.I. needed"; that she "was not lacking in parenting skills"; that "failure to complete the parenting and domestic violence classes should not be considered against [her] when reviewing case plan compliance"; and that her testimony further indicates that she is "prepared to help with the care for S.M.I." Appellant's Brief at 17-18. The domestic court, by contrast, found that S.M.I. "cannot be placed with a Parent now or within a reasonable time as the Parents are not able or willing to meet the needs of the Child. * * * The Child needs a permanent placement now. It is abundantly clear that a legally secure permanent placement cannot be achieved for [him] without an order of permanent custody to the Agency." Jgmt. Entry Granting Permanent Custody at 12.

{¶ 24} Again, there is competent, credible evidence to support the domestic court's position, and this factor, too, weighs for the grant of permanent custody to the County. Evidence reflects that neither biological parent has taken the steps needed fully to familiarize herself or himself with the ins and outs of care needed to safeguard S.M.I.'s life, and that neither has demonstrated the sort of sustained commitment to task and detail that is so critical in this special case. *See, e.g.,* Tr. at 28, 58, 63, 160, 197-99, 245-46, 260-61. The record of unmade or missed appointments engenders no confidence that Mother (or Father) could maintain attention to S.M.I.'s medical needs as required minute-by-minute when the outside nurses are off. *Compare, e.g.,* Tr. at 245-46 (failure to acquire medical information and attend medical appointments) *with* Tr. at 112 (constant importance of "airway management"), 126 (avoiding any neglect is of "life-and-death" significance).

{¶ 25} Rather, as the domestic court underscored, the record is replete with evidence showing their failure to satisfy important terms of the reunification/care plans. Mistaken beliefs as to what S.M.I. can consume, for example, *compare* Tr. at 20 (biological mother believes S.M.I. can take small portions of food through mouth) *with id.* at 80-81 (can ingest only through tube) clearly could have devastating consequences. The domestic

court also was justified in finding that "Parents never identified an alternative-care provider who indicated a willingness to be trained to meet [S.M.I.'s] needs"; that "[n]either parent ever completed a parenting program"; that [n]either parent completed a domestic violence assessment"; and that "Parents failed to present credible and reasonable explanations for their failure to visit or contact [S.M.I.]," a failure that the domestic court properly found to deprive S.M.I. of an "essential *basic need*." Jgmt. Entry Granting Permanent Custody at 9-10 (emphasis in original); *see, e.g.,* Tr. at 48-49 (biological mother admits that her mother and father, proposed as potential relief care-givers, have not taken training to care for S.M.I.), 209 (County caseworker testifies that apart from housing/employment provisions, biological mother has not completed any aspect of care plan).

{¶ 26} Again in contrast, "the foster father and foster mother received training and are licensed to provide foster care for medically fragile children, [and] the foster mother [took the time and effort to receive[ ] additional training over a period of two weeks before S.M.I. was released from the hospital to the foster home." Jgmt. Entry Granting Permanent Custody at 8; *see, e.g.,* Tr. at 74-80.

{¶ 27} As to the fifth statutorily specified "best interest" factor, *see* R.C. 2154.414(D)(1)(e), although the domestic court found that "[n]o evidence was offered as to the * * * factors listed in divisions (E)(7) to (11) of R.C. 2154.414," Jgmt. Entry Granting Permanent Custody at 12, the court did conclude relative to R.C. 2151.414(B)(1)(b) that its findings "establish[ed] a presumption of abandonment by Parents and the Parents have failed to offer a reasonable explanation for their failure to visit [S.M.I.]" *Id.* at 13.

{¶ 28} Our review of the entire record persuades us that the domestic court did indeed have competent and credible evidence to support its conclusion that permanent commitment to the County is in S.M.I.'s best interest and that the parental rights of the biological parents should be terminated consistent with that grant. We therefore overrule Mother's first assignment of error.

{¶ 29} Mother's second assignment of error is that the evidence does not show that the County made reasonable efforts at reunification. Appellant's Brief at 18. Her view is premised on the belief that "[t]he Agency's lack of effort in this case made it nearly impossible for Mother to complete her case plan." *Id.* at 20. But as the discussion above reflects, it is not the County here that has demonstrated a "lack of effort."

{¶ 30} Except in a few "narrowly defined" circumstances, the County must "make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights.  If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43.

{¶ 31} Here, the domestic court magistrate determined in its entry of February 1, 2017 that "Franklin County Children Services made reasonable efforts to prevent the continued removal of the child from the home and to implement a permanency plan." Feb. 1, 2017 Findings of Fact and Conclusions of Law.

{¶ 32} In its final order granting permanent custody to the County, the domestic court further found that "[r]eunification efforts have been unsuccessful"; that by the terms of R.C. 2151.414(E), "the Parents have failed continuously and repeatedly to substantially remedy the conditions causing the Child to be placed" outside the home, "demonstrated a lack of commitment to [S.M.I.] by failing to complete the case plan, failing to demonstrate that they can care for [him], and failing to visit," and "have abandoned the Child"; and that the County "has made reasonable efforts to finalize the permanency plan in effect for the Child" in keeping with the provisions of R.C. 2151.419 (which does not apply here by its precise terms, *see In re C.F.* at ¶ 41, 43).   Jgmt. Entry Granting Permanent Custody at 13, 14.

{¶ 33} The domestic court's conclusions here are supported by the evidence for many of the same reasons that the grant of permanent custody to the County is in S.M.I.'s best interests.   The case plan established a reasonable roadmap toward potential reunification, but the biological parents proved unable or unwilling to comply with point after point.   *Id.* at 8-11 (cataloging significant and numerous deficiencies); *see, e.g.,* Tr. at 261 (G.A.L.: "the parents have been asked and given lots of opportunity in the last two years or so to get the training, to meet with doctors, to do certain things, to learn what they would need to do; in addition to * * * finding out about the machines, the equipment, * * * and the medication[,] and none of that has been done"), 209 (caseworker details many aspects of case plan that have gone unmet, with biological mother and father not getting required counseling or training for necessary medical care).   For all the reasons expressed by the

trial court, the multiple and sustained failures at plan compliance signal that reunification would pose enormous danger to this medically fragile child.

{¶ 34} Review of the entire record shows that the domestic court had competent and credible evidence to support its various conclusions by clear and convincing evidence that the County made reasonable efforts at reunification and that granting the County's motion for permanent custody was in S.M.I.'s best interest. We overrule the biological mother's second assignment of error.

**CONCLUSION**

{¶ 35} The domestic court's judgment terminating the parental rights of the biological parents and awarding permanent custody of S.M.I. to the County is supported by competent and credible evidence. Having overruled the biological mother's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BROWN and BRUNNER, JJ., concur.

—————————————